UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

--------------------------------------------------------x
                                                      :

JERILYN ANNE GENDRON                :                  3:17 CV 207 (JGM)
                                                        :

V.                                               :
                                                        :

NANCY A. BERRYHILL                  :
ACTING COMMISSIONER OF SOCIAL     :
SECURITY                             :           DATE: FEBRUARY 8, 2018
                                                        :
-------------------------------------------------------- x

## RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A REHEARING, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Supplemental Security Income benefits ["SSI"].

## I.  ADMINISTRATIVE PROCEEDINGS

On July 26, 2013, plaintiff applied for SSI benefits[1] claiming that she has been

disabled since May 21, 2009 due to vertigo.  (Certified Transcript of Administrative

Proceedings, dated April 8, 2017 ["Tr."] 413-20, 431 (listing severe vertigo, depression and

anxiety); see Tr. 38 ("Q[:] Is vertigo the only reason you're asking for Disability Benefits?

A[:]  Yes."))[2]  The Commissioner denied plaintiff's application initially and upon

---

[1]Plaintiff has prior applications from April 2011 for SSI and Disability Insurance Benefits in the administrative record (see Tr. 381-96; see generally Tr. 69-133, 153-80, 441-503), which, after a hearing before Administrative Law Judge ["ALJ"] Kim K. Griswold, were denied on June 27, 2012. (See Tr. 134-47; see Tr. 35-36; see also Tr. 181-242, 258-345). On May 22, 2013, the Appeals Council affirmed the ALJ's decision, thereby rendering a final decision. (See Tr. 35-36). Rather than appeal that final decision, plaintiff filed her current application just over two months later. (Tr. 413-20).

[2]In the hearing decision in this case, ALJ Leonard Cooperman recites that after the Appeals Council affirmed ALJ Griswold's denial of plaintiff's application for benefits, plaintiff, "[u]ndaunted, less than three months after the [A]ppeals [C]ouncil's action, . . . filed the present application for benefits, reiterating that she was disabled as of May 21, 2009 and adding two additional

reconsideration.  (Tr. 306-25).  On or about April 3, 2014, plaintiff requested a hearing before an Administrative Law Judge ["ALJ"](Tr. 326; see Tr. 327-44), and on May 14, 2015, plaintiff and Mark Riccio, a vocational expert, testified at a hearing before ALJ Leonard J. Cooperman.  (Tr. 33-68; see Tr. 347-65, 372-78).  Plaintiff has been represented by counsel at the administrative level and on this appeal.  (See Tr. 290-91). In a decision dated June 22, 2015, ALJ Cooperman denied plaintiff's request for benefits.  (Tr. 16-28).  On August 10, 2015, plaintiff filed a request for review of the ALJ's decision (Tr. 14-15), and on December 12, 2016, the Appeals Council filed its notice denying plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3; see Tr. 4-11).

On February 13, 2017, plaintiff commenced this current action (Dkt. #1), and on May 1, 2017, defendant filed her answer and a copy of the Certified Administrative Transcript, dated April 8, 2017. (Dkt. #12).   On the same day, the parties consented to this Magistrate Judge's jurisdiction and the case was transferred accordingly.  (Dkt. #13).  On August 7, 2017, plaintiff filed her Motion to Reverse, or in the alternative, Motion to Remand for a Rehearing (Dkt. #17; see Dkts. ##15-16), attached to which is plaintiff's brief in support and a Joint Stipulation of Facts.  On October 5, 2017, defendant filed her Motion to Affirm, with brief in support.  (Dkt. #18).[3]  On October 20, 2017, plaintiff filed her reply brief.  (Dkt. #19).

---

impairments to the ones she previously alleged."  (Tr. 22)(footnotes omitted).  Specifically, in her hearing testimony before ALJ Griswold, plaintiff "indicated [that] vertigo was the only reason she was seeking benefits. Not hearing loss, not anxiety, not depression.  Only vertigo."  (Id., n.5)(emphasis in original).  In this "current appeal, [plaintiff] adds the impairments of acid reflux and asthma to the list of those impairments she claimed before ALJ Griswold[.]" (Id., n.4).   Yet, in her hearing before ALJ Cooperman, plaintiff emphasizes that she is only seeking disability due to vertigo. (Tr. 37-38).

[3]The Court cites to the page numbers of the brief rather than the page numbers assigned by CM/ECF.

For the reasons stated below, plaintiff's Motion for Order to Reverse the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing (Dkt. #17) is denied, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #18) is granted.

## II. FACTUAL BACKGROUND

### A. PLAINTIFF'S ACTIVITIES OF DAILY LIVING

Plaintiff was born in 1967 and is fifty years old. (Tr. 43, 413). At the time of her hearing, she was living alone in an apartment (Tr. 43, 524), and she was volunteering two hours a week at a soup kitchen near her residence, where she takes attendance and wraps utensils. (Tr. 43-44, 48).

At her hearing before ALJ Cooperman, plaintiff testified that she filed a new application for benefits because her vertigo symptoms "have basically gotten a bit worse." (Tr. 37; see Tr. 461).[4] According to plaintiff, her episodes of vertigo occur more frequently – three to four times a day, with some days "much worse than others." (Tr. 38, 49). They occur episodically and they last for seconds. (Tr. 49). When the attacks occur, plaintiff feels dizzy and everything around her spins, which affects her balance. (Tr. 50; see Tr. 51-52). Additionally, she develops a rapid heartbeat, she sweats, and she feels "very shaky, weak and very tired." (Tr. 50). A "severe attack" can cause "after effects [that] can last hours if not up to a couple [of] days." (Id.; see also Tr. 51). Her vertigo is triggered by lifting her head, turning side to side, bending, and lifting. (Tr. 49). Plaintiff testified that the only reason she is seeking disability benefits in this underlying application is because of her

_____

[4]See note 2 supra.

3

vertigo. (Tr. 37-38).[5]

Plaintiff testified that in a typical day, she cares for her dog, does dishes, takes care of household chores, and makes simple meals when she is "capable" of doing so. (Tr. 48, 524-25, 527, 553, 556; see also Tr. 441 (cares for two cats), 443-44). However, "[s]ome days[, she] feel[s] too lightheaded, too dizzy and too weak" for her usual activities, so she just rests. (Tr. 48; see also Tr. 561-62). She lays down two or three times during the day (Tr. 49), and she has trouble falling asleep. (Tr. 554; see also Tr. 442). She reads, watches television, and uses the computer. (Tr. 528, 557; see also Tr. 445). Plaintiff drives to the soup kitchen where she volunteers, and drives "[t]wo, maybe three[]" times a week, but does not drive distances longer than three miles. (Tr. 44-46). She drives herself, and sometimes a friend, to medical appointments, and to go food shopping. (See Tr. 441, 444). Plaintiff testified that she is able to hear other drivers, and she can hear sounds on the road (Tr. 45), and that she does not "step foot in [her] car[]" on days when she does not feel well. (Tr. 54; see also Tr. 444, 446, 527). She acknowledged that she never knows when the attacks will come on (Tr. 54; see also Tr. 562), and she testified that she gets a "few seconds" warning prior to getting a full-fledged vertigo attack. (Tr. 56). However, she also reported that "even sitting[,] vertigo happens at any time without warning." (See Tr. 445; see also Tr. 446).

Plaintiff takes or has taken Citalopram for anxiety, Lisinopril for high blood pressure, and Meclizine and Trazodone for vertigo, as well as Proventil, Pulmicort and Advair for asthma. (Tr. 433, 494, 526, 555). Plaintiff reported that she has anxiety and panic disorder,

---

[5]Despite plaintiff's representation at her hearing that her only disabling condition is vertigo, plaintiff's counsel also addressed plaintiff's history of asthma (Tr. 58); carpal tunnel (Tr. 59); depression (Tr. 60); blurry eyes (Tr. 61-62); ringing in her ears (Tr. 62); difficulty sleeping (id.); and headaches (id.).

4

and as a result, she does not handle stress well.  (Tr. 530, 559; see also Tr. 447).

Plaintiff completed high school (Tr. 431, 515), and has worked as an "order selector" in a warehouse, a dishwasher and bartender, and a deli clerk.  (Tr. 432; see also Tr. 46-47, 449-54, 490, 504-07, 515, 534-39, 543-44).  Plaintiff stopped working on May 21, 2010 (Tr. 432), but started to take time off from work as of January 1, 2009.  (Tr. 439, 473).  At her hearing, the vocational expert testified that plaintiff's past work is considered light work, with general interaction with the public.  (Tr. 63).  When asked if a person with limitations of avoiding unprotected heights and climbing could perform plaintiff's past work, the vocational expert testified that such a person could not perform plaintiff's past work but could work as a ticket seller, parking lot attendant, and laundry sorter.  (Tr. 63-64).  However, if such a person was absent three or more days a month, such person would be precluded from all work.  (Tr. 65).

### B. PLAINTIFF'S MEDICAL RECORDS[6]

In the application for benefits at issue on this appeal, plaintiff has alleged that she is disabled as of May 21, 2009;[7] accordingly, the Court will address plaintiff's medical history from that time frame forward, focusing on the relevant period at issue in this case, which is from July 11, 2013, the date of plaintiff's application for SSI, to June 22, 2015, the date of ALJ Cooperman's decision.  (See Tr. 19-28).

Plaintiff's history of dizziness dates back to February 5, 2009, when she was seen at Generations Family Health Center ["Generations"] for a sinus infection, cough and dizziness.  (Tr. 588).  She was seen again for the same or similar symptoms on February 13 and 17,

---

[6]The Court has reviewed the entire medical record and incorporates the parties' Joint Stipulation of Facts herein.  (See Dkt. #17-2).

[7]See note 16 infra.

2009, and March 3, 2009.  (Tr. 585-87).  On March 25, 2009, plaintiff was seen by Dr. Christopher Charon for positional vertigo without ocular findings on the Dix-Hallpike test, but with "dramatic emotional responses to each position in the Dix-Hallpike and Epley maneuver[.]"  (Tr. 706-09).  She had no hearing loss based on the audiogram.  (Tr. 708).  Plaintiff returned to Dr. Charon on April 1, 2009; she reported that her positional vertigo was improving but she could not lay on her right side due to spinning, and that she had minimal improvement with Meclizine.  (Tr. 704-05).  Plaintiff also reported that she "[f]requently [has to] ask others to repeat themselves," as both of her ears feel "full," and she has constant tinnitus in both ears.  (Tr. 704).  Dr. Charon noted that plaintiff had done some exercises at home and her vertigo diminished.  (Tr. 705).  The next day, plaintiff was seen at Generations for postural vertigo, neck pain, and depression.  (Tr. 584).

From April 8, 2009 through July 8, 2009, plaintiff received rehabilitation therapy for neck pain and vertigo at Day Kimball Hospital Rehabilitation Services.  (Tr. 615-33). Plaintiff was seen at St. Luke's Family Practice ["St. Luke's"] on June 11, 2009 for complaints of vertigo when she bent down or lay flat in bed, and she complained of significant vertigo when lying on her right side.  (Tr. 639).

On May 4, 2009, plaintiff returned to Generations with complaints of continued vertigo and neck pain.  (Tr. 583).  Twenty-two days later, plaintiff was seen at St. Luke's by Dr. Daniel O'Neill for complaints of neck pain.  (Tr. 640).

On June 18, 2009, Dr. Hellen Kim, a neurologist, diagnosed plaintiff with persistent vertigo with questionable cervicogenic etiology.  (Tr. 691, 794). Plaintiff underwent a brain MRI on June 25, 2009 which revealed "[b]orderline increased signal intensity at the callosal septal interface[];" it was noted that plaintiff "should be further evaluated clinically as well

as [undergo a] follow-up MRI examination to exclude possibility of early MS." (Tr. 689).[8]

Five days later, Dr. O'Neill signed a form stating that plaintiff is disabled and unable to work from May 26 to June 30, 2009 due to an "abnormal MRI being worked up by neurology[.]" (Tr. 798).

On October 14, 2009, Dr. Kim opined that plaintiff's vertigo is "likely" related to alcohol and tobacco use with dehydration "as the exacerbator." (Tr. 688, 793). On November 11 and December 16, 2009, plaintiff's vertigo was stable but she continued to complain of neck pain, for which she was referred for physical therapy. (Tr. 687, 792).[9]

On January 27, 2010, plaintiff was evaluated by Dr. Kim for neck pain and tail bone pain; she was advised to continue therapy and start lidocaine injections (Tr. 686), which she received on February 1 and 4, 2010. (Tr. 685). On February 19, 2010, plaintiff was seen at St. Luke's for vertigo and chronic dizziness. (Tr. 637). Medical notes from St. Luke's on April 16, 2010 reflect that plaintiff's vertigo had improved, and it is noted that her "vertigo is possibly related to anxiety disorder[.]" (Tr. 636).

On April 22, 2010, plaintiff underwent a polysomnogram for excessive daytime sleepiness, snoring and obstructive sleep apnea. (Tr. 589-90, 682-83, 800-01). Plaintiff was diagnosed with "[s]imple [s]noring[,]" as well as "[s]leep [o]nset and maintenance [i]nsomnia[,]" and she was advised to consult a sleep specialist. (Tr. 590, 683, 801).[10]

On July 16, 2010, plaintiff was seen at the emergency room at Day Kimball Hospital

---

[8]Plaintiff underwent an MRI of her cervical spine two days earlier, the results of which showed no evidence of changes. (Tr. 690).

[9]On January 23, 2010, plaintiff was admitted to Day Kimball Hospital with coccyx pain from falling when she had been drinking. (Tr. 604-13).

[10]On March 5 and June 11, 2010, plaintiff was seen by Dr. Kim for sleep disturbance. (Tr. 681, 684).

for sudden onset dizziness that involved room spinning as well as vertigo, and swelling in her right leg. (Tr. 596; see Tr. 594-95, 597-603, 799).

Plaintiff was seen at St. Luke's on March 2, 2011 for vertigo of "unclear etiology[]" and hypertension, which was well controlled. (Tr. 652). Plaintiff "elude[d] to the fact that she might want to apply for Social Security Disability." (Id.). Plaintiff underwent a brain MRI on March 11, 2011, the results of which were "unremarkable[.]" (Tr. 656, 797).

On July 12, 2011, plaintiff was evaluated at Day Kimball Healthcare for benign positional vertigo. (Tr. 657-69; see Tr. 757-61). Plaintiff received treatment through August 9, 2011, and was discharged with a home program. (Tr. 657-59; see Tr. 756, 762-67).

On January 25 and February 22, 2012, plaintiff was evaluated at St. Luke's. (Tr. 674). She had frequent, daily vertigo attacks and was diagnosed with acute adjustment disorder on January 25, 2012. (Id.). A month later, she was dysthymic with some depressed affect, and she was diagnosed with acute adjustment disorder with depressed mood and underlying major depression. (Id.).

On May 15, 2012, plaintiff had a consultation for her vertigo with Dr. Grazyna Pomorska of Day Kimball Hospital. (Tr. 694-95). Plaintiff reported that she experienced a "spinning sensation which comes and goes[]" and which occurred multiple times during the day "at any time and in any position[.]" (Tr. 694). She reported that the episodes lasted for a few minutes and would subside if she stayed still, and after the episodes she felt "weak and awful all day." (Id.). Plaintiff mentioned a history of neck pain in 2009 that was resolved with physical therapy. (Tr. 695). Dr. Pomorska recommended an MRI of the brain and MRA of the head and neck; vestibular therapy; a referral to an ENT; and Meclizine. (Id.). Her impression was "possibly benign paroxysmal positional vertigo[,]" vestibulopathy, or central vertigo. (Id.).

8

Plaintiff was seen by Dr. Charon on May 17, 2012 for rotatory vertigo with lying down. (Tr. 698, 714; see Tr. 698-701, 714-16). She had no hearing loss, and audiometry testing was normal. (Tr. 698-701). An MRI of the brain and an MRA of the head and neck on May 24, 2012 were normal. (Tr. 733, 795-96). On May 31, 2012, videonystagmography and other testing indicated no evidence of significant peripheral vestibular dysfunction, although there was evidence of significant central vestibular dysfunction, and balance rehabilitation was recommended. (Tr. 725-27). Plaintiff returned on June 6, 2012, at which time Dr. Charon assessed vertigo without ocular findings, unremarkable vestibular exam and audiogram, and normal MRI and MRA studies. (Tr. 718-19, 795-96). On July 27, 2012, plaintiff was seen by Dr. Pomorska for vertigo which plaintiff reported was triggered by movement. (Tr. 791). On August 29, 2012, plaintiff underwent an audiological evaluation for possible hearing loss. (Tr. 825-29).

On October 10, 2012, plaintiff returned to Dr. Pomorska with complaints of lightheadedness when she got up too quickly, and vertigo. (Tr. 790). On October 25, 2012, plaintiff underwent a motor nerve conduction study that revealed bilateral mild median neuropathies at the wrist (carpal tunnel syndrome) with "evidence of demyelination but no axonal degeneration." (Tr. 738). Plaintiff was seen by Dr. Pomorska on November 19, 2012 at which time she reported bouts of vertigo lasting two to three minutes at a time. (Tr. 788-89). Dr. Pomorska's impression was "[p]robable benign paroxysmal positional vertigo." (Tr. 789).

On January 9, 2013, plaintiff returned to Dr. Charon, who diagnosed her with a deviated nasal septum, vertigo with unremarkable vestibular exam and audiogram, and left central vestibular dysfunction. (Tr. 720-21, 786). Plaintiff was referred for physical therapy at Day Kimball Healthcare on January 23, 2013, and was discharged on February 28, 2013

without improvement in her vertigo symptoms, and no objective tests consistent with benign paroxysmal positional vertigo. (Tr. 731-32). Plaintiff returned to Dr. Charon on February 28, 2013 after she had undergone vestibular rehabilitation; the rehabilitation did not improve her symptoms. (Tr. 722-23, 784-85). A Lyme test, which was ordered "since her ent[ire] vertigo eval was negative from an otologic standpoint[,]" was also negative. (Tr. 787).

On September 3, 2013, plaintiff returned to Dr. O'Neill, asking for a referral to an ENT specialist for her daily vertigo. (Tr. 776-78). On October 3, 2013, plaintiff received an MRA of her neck without contrast that revealed bilateral ICA narrowing slightly greater over the right; the stenosis was better visualized on the lateral projections; normal MRA of cervicocerebral arch and its branches; codominant vertebral arteries; and correlation with ultrasound velocities for the cartoid stenosis was recommended. (Tr. 768, 779, 824).

On October 15 and November 4, 2013, plaintiff was seen by Dr. O'Neill for fatigue, depressive disorder, and peripheral vertigo (Tr. 769-78, 818-23), and on November 4, 2013, plaintiff was diagnosed with COPD. (Tr. 769, 771-72, 818-20).[11] Dr. O'Neill noted that plaintiff had no hearing loss (Tr. 771, 774, 820, 823) and that plaintiff requested another evaluation for her vertigo, observing that the testing had been "unrevealing[,]" and the MRA did not explain the etiology. (Tr. 772, 775, 821, 823).

On February 3, 2014, plaintiff was seen by Dr. O'Neill for stress, depression and vertigo, with poor sleep; she was diagnosed with vertigo, depressive disorder and tobacco dependence. (Tr. 812-14, 851-54). On February 25, 2014, plaintiff was seen for complaints of persistent vertigo; she was assessed with chest pain, tobacco dependence, and vertigo

---

[11]Plaintiff was seen on December 20, 2013, October 14 and October 21, 2014 for asthma related symptoms  (Tr. 816-18, 833-38), and on May 7, 2014, she was seen for cold symptoms. (Tr. 844-46). Plaintiff is an "every day smoker." (Tr. 821).

with general symptoms of dizziness and giddiness. (Tr. 850-51). On April 8, 2014, plaintiff reported that she fell three times since her last visit due to her vertigo. (Tr. 846; <u>see</u> Tr. 847-49). On June 24, 2014, Dr. O'Neill noted that "[v]estibular physical therapy, maneuvers, medications have proven ineffective[,]" so Dr. O'Neill gave plaintiff a trial of transient barium scopolamine and discussed further vestibular exercises. (Tr. 843; <u>see</u> Tr. 841-42). When plaintiff was seen on August 4, 2014, it was noted that she is "trying to get disability and will continue to monitor symptoms." (Tr. 840; <u>see</u> Tr. 838-41).

On May 4, 2015, plaintiff reported to Dr. O'Neill that she had some hearing loss but it was not getting worse. (Tr. 830; <u>see</u> Tr. 831-32). On May 13, 2015, plaintiff had a borderline normal audiological exam, showing mild hearing loss. (Tr. 862). It was noted that plaintiff should take "noise/music precautions". (<u>Id.</u>). Dr. Charon reviewed the report and stated that the audiometry showed "mild bilateral high frequence sensorineural hearing loss and tympanometry showed normal type A tmypanograms bilaterally with normal EAC volume." (Tr. 863). Dr. Charon noted that in 2009, plaintiff had "significant subjective vertigo on Dix-[H]alpike bilaterally without oc[]ular findings[, and] [t]oday she also had no oc[]ular findings but also had minimal vertigo with this maneuver." (<u>Id.</u>). He found that plaintiff had "[m]ild sensorineural hearing loss in both ears (high frequency) with borderline thresholds a[]cross all frequencies[]" which "represents a worsening since 2012, but she is still not a candidate for hearing aids." (<u>Id.</u>).

### C. MEDICAL OPINIONS, EVALUATIONS AND ASSESSMENTS OF STATE AGENCY CONSULTANTS

On May 20, 2011, plaintiff underwent a Psychological Evaluation by Kathleen Murphy, Ph.D., in connection with her application for benefits. (Tr. 641-43). Plaintiff reported that her episodes of vertigo began in 2009 when she was driving, and the episodes occur daily,

without warning. (Tr. 641). She reported that a typical day involves watching television, playing on her computer, going outside for air, helping her friend's husband with yard work, and then lying down. (Tr. 643). Dr. Murphy assessed plaintiff as functioning in the borderline range of intelligence, with self-reported panic disorder with agoraphobia. (Id.). She assigned plaintiff a GAF of 59. (Id.).

On June 2, 2011, State agency medical consultant Dr. Maria Gumbinas, a neurologist, assessed plaintiff's vertigo as severe, but not listing level. (Tr. 78). Dr. Gumbinas completed a Residual Functional Capacity Assessment in which she found that plaintiff had no exertional limitations, but was limited to occasionally climbing ramps or stairs, never ladders, ropes, or scaffolds, and frequently balancing but with minimized exposure to unprotected heights and hazards due to episodic vertigo. (Tr. 92-94).

The next day, State agency psychological consultant Dr. Janine Swanson assessed that, based on estimated intellectual functioning and anxiety symptoms, plaintiff would likely have difficulty understanding and remembering complex, multi-step instructions, but would have the ability to understand and follow simple directions of two to three steps as evidenced by her ability to drive, manage finances, prepare meals, and independently manage her medications, and could attend to simple tasks for at least two hours at a time. (Tr. 79-82).

On August 15 and 19, 2011, respectively, Jerome Sarveur, PT, of Day Kimball Hospital and Dr. Daniel W. O'Neill of St. Luke's Family Medicine cosigned a Residual Functional Capacity Questionnaire in which they stated that plaintiff suffers from benign postural vertigo, with varied episodes occurring from three to as many as six times per day lasting up to several hours. (Tr. 710-11). Plaintiff's episodes of vertigo would cause her to miss work more than four times per month and require unscheduled breaks of undetermined duration. (Id.). Sarveur and Dr. O'Neill concluded that "for safety, [plaintiff] would need to

cease work activity." (Tr. 711).

On December 7, 2011, State agency psychological consultant Dr. Susan Uber assessed that plaintiff would likely have difficulty understanding and remembering complex, multi-step instructions, but demonstrated the ability to understand and follow simple directives of two to three steps as evidenced by her ability to drive, manage finances, prepare meals, and independently manage her medications, and she could attend to simple tasks for at least two hours at a time. (Tr. 113-15). Dr. Uber assessed that plaintiff's anxiety symptoms would occasionally interfere with optimal performance and productivity, but that plaintiff appeared capable of engaging with adequate concentration, persistence, and pace in simple, routine, and repetitive tasks on a full-time basis. (Tr. 114). Plaintiff "doesn't like dealing with people[]" and may be uncomfortable working with the public and may on occasion distract coworkers with symptoms of panic or vertigo, but was able to relate and communicate effectively for purposes of workplace functioning. (Id.).[12]

On March 9, 2012, Dr. O'Neill completed a Residual Functional Capacity Questionnaire in which he noted plaintiff's diagnosis of positional vertigo with a fair prognosis, with symptoms of severe vertigo, nausea, and an inability to move her head. (Tr. 670-71). At that time, she was experiencing sedation as a side effect from her medications (Tr. 670), and her condition would require additional breaks to recline or lie down in excess of the typical fifteen-minute break in the morning, thirty to sixty minute lunch break, and the fifteen-minute break in the afternoon. (Id.). She could walk one block without rest or significant pain, sit for thirty minutes, stand for thirty minutes, sit for three hours in an eight-

_____

[12]On December 8, 2011, State agency medical consultant Dr. Anita Bennett concurred with Dr. Gumbinas' earlier assessment. (Tr. 111).

hour day, and stand or walk for two hours. (Id.). Additionally, she would require unscheduled daily breaks of two minutes to two hours, and she could lift and carry less than ten pounds frequently, and up to ten pounds occasionally. (Tr. 671). According to Dr. O'Neill, plaintiff would be absent from work as a result of her impairments more than four times a month. (Id.).

A month later, on April 23, 2012, Dr. O'Neill completed another Residual Functional Capacity Questionnaire, noting plaintiff's diagnosis of chronic vertigo with a poor prognosis, with symptoms of vertigo with head motion, and drowsiness from her medication. (Tr. 677-78). In his opinion, plaintiff would not require additional breaks to recline or lie down in excess of the typical breaks in a work day, but she would require unscheduled breaks daily, and she could sit for eight hours in an eight-hour workday, and could stand or walk for two hours. (Tr. 677). Additionally, she could walk for one block without significant pain, and could lift and carry less than ten pounds frequently and up to ten pounds occasionally. (Tr. 677-78). In Dr. O'Neill's opinion, plaintiff would be absent from work more than four times a month, and was incapable of working eight hours a day, five days a week. (Tr. 678).

On November 23, 2012, plaintiff underwent a second Psychological Evaluation by Dr. Murphy in connection with her application for benefits. (Tr. 802-05). Dr. Murphy noted that the etiology of plaintiff's vertigo symptoms was "unknown." (Tr. 802). Plaintiff reported that she drives regularly and there are no restrictions on her license. (Tr. 804). However, she does not drive if she feels "off." (Id.). She performs her home chores independently, and she visits parents and friends once or twice a week. (Id.). According to plaintiff, she reads, watches television, plays games on her computer, naps and cares for her dog. (Id.).

On November 27, 2013, State agency medical consultant Dr. Rafael S. Wurzel assessed that plaintiff had no exertional limitations; could frequently climb ramps or stairs;

could never climb ladders, ropes or scaffolds; could never balance; and could frequently stoop and crawl. (Tr. 159-61). Additionally, she should avoid concentrated exposure to extreme cold, extreme heat, noise, and vibration; avoid moderate exposure to fumes, odors, dusts, gases, or poor ventilation; and avoid all exposure to hazards. (Tr. 160). Dr. Wurzel noted that plaintiff had full ENT and neurological workups, which were unremarkable, and that plaintiff was able to drive a car, watch television, use a computer, and read. (Tr. 161).[13]

On December 4, 2013, State agency psychological consultant Dr. Warren Leib assessed that plaintiff did not have a severe mental impairment (Tr. 158), and two months later, on February 7, 2014, State agency psychological consultant Dr. Janine Swanson reached the same conclusion. (Tr. 171-72).

## III. DISCUSSION

Following the five step evaluation process,[14] ALJ Cooperman found that plaintiff has not engaged in any substantial gainful activity since July 11, 2013, the alleged onset date. (Tr. 21, citing 20 C.F.R. § 416.971 et seq.). ALJ Cooperman then concluded that plaintiff has

---

[13]On March 27, 2014, State agency medical consultant Dr. Luis M. Zuniga concurred with Dr. Wurzel's assessment. (Tr. 173-74).

[14]Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 416.920(a). If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment. See 20 C.F.R. § 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. § 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. § 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. See 20 C.F.R. § 416.920(a)(4)(iv). If the claimant shows that she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. § 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

the following severe impairments: peripheral vertigo/benign episodic vertigo, anxiety and depression. (Tr. 21-24, citing 20 C.F.R. § 416.920(c)). The ALJ found that plaintiff's asthma is a non-severe impairment, "as [plaintiff] smokes against medical advice and alleged at [her] hearing that vertigo was the only reason she sought disability benefits." (Tr. 24). In the third step of the evaluation process, the ALJ concluded that plaintiff's impairment or combination of impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404. (Tr. 24-25, citing 20 C.F.R. §§ 416.920(d), 416.925, 416.926). In addition, at step four, ALJ Cooperman found that after consideration of the entire record, plaintiff has the residual function capacity ["RFC"] to perform light work[15] as defined in 20 C.F.R. § 404.1567(b), except that she could not be exposed to unprotected hazards, heights or machinery, could not climb in an area other than one which was enclosed and had handrails, and could remember and carry out no more than simple instructions. (Tr. 25-26). The ALJ found that plaintiff is unable to perform her past work, but considering her age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform. (Tr. 26-27, citing 20 C.F.R. §§ 416.969, 416.969(a)). Accordingly, ALJ Cooperman concluded that plaintiff has not been under a disability since July 11, 2013, the date her application was filed. (Tr. 27,[16] citing 20 C.F.R. § 416.920(g)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds

---

[15]Light work as defined in 20 C.F.R. § 416.967(b) involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds, and jobs in this category require a good deal of walking or standing, or sitting most of the time with some pushing and pulling of arm or leg controls.

[16]Although ALJ Cooperman cites to July 11, 2013 as the date plaintiff's application was filed, the application bears a date of July 26, 2013. (Tr. 413).

that the ALJ erred in failing to give substantial or controlling weigh to the treating physician opinions in the record (Dkt. #17, Brief at 2, 4-9); the ALJ applied a "non-existent standard, unsupported by the [R]egulations or rulings governing the determination of residual functional capacity[]" (id. at 2, 10-12); and the ALJ failed to analyze the claim that plaintiff's vertigo meets Listing 2.07. (Id. at 3, 13-14).

Defendant contends that the ALJ properly evaluated the criteria of Listing 2.07, and correctly found that plaintiff lacked hearing loss, and that there is no evidence that plaintiff's episodes of vertigo prevented her from performing demanding activities, such as driving. (Dkt. #18, Brief at 5-10).[17] Additionally, defendant contends that the ALJ properly assessed plaintiff's RFC in that the ALJ "was not legally obligated to weigh evidence from a period in which [p]laintiff was previously found not disabled[,]" and, the ALJ reasonably considered that driving weighed against allegations of totally disabling episodes of vertigo. (Id. at 10-15). In her reply brief, plaintiff asserts that driving a car does not refute a disability for vertigo (Dkt. #19, at 1-2); the ALJ failed to adequately discuss plaintiff's hearing loss (id. at 2-3); and that Dr. O'Neill's prior medical opinion remains relevant. (Id. at 3-4).

A. RESIDUAL FUNCTIONAL CAPACITY ANALYSIS

1. TREATING PHYSICIAN'S OPINION

Plaintiff contends that the ALJ erred in failing to afford controlling weight to the opinions of Dr. O'Neill, who has treated plaintiff since 2009. (Dkt. #17, Brief at 4-9). Specifically, plaintiff contends that the ALJ erred in concluding that "[n]o provider of medical care has opined on [plaintiff's] vocational capacity[]" (Tr. 24), when Dr. O'Neill completed two Residual Functional Capacity Questionnaires that set forth limitations that prevent

---

[17]See note 3 supra.

plaintiff from working. (Dkt. #17, Brief at 5-6).

As discussed above, plaintiff filed her current application for benefits on July 26, 2013, and it is the denial of that application that is on appeal to this Court. As ALJ Cooperman stated in his decision, "I find no reason not to apply res judicata to the period of time at and prior to Judge Griswold's decision, and consider the evidence as it stood at and subsequent to her decision." (Tr. 22, n. 4). ALJ Cooperman also "adopt[ed] Judge Griswold's decision into [his] own, except where it [was] inconsistent with [his decision]." (Tr. 22, n. 2).

The ALJ properly views ALJ Griswold's decision, and the evidence upon which she relied, as a matter of administrative res judicata. See 20 C.F.R. § 416.1457(c)(1)("The administrative law judge [may] decide[] that there is cause to dismiss a hearing request entirely or to refuse to consider any one or more of the issues because . . . [t]he doctrine of res judicata applies . . . ."). "'The application of administrative res judicata has been recognized and enforced by the [U.S.] Supreme Court, and the Second Circuit has deemed it appropriate in Social Security cases.'" Brown v. Berryhill, No. 15 CV 8201 (VSB)(BCM), 2017 WL 2493275, at *6 (S.D.N.Y. Mar. 3, 2017), quoting Stellacci v. Barnhart, No. 02 Civ. 8875 (SAS), 2013 WL 22801554, at *5 (S.D.N.Y. Nov. 24, 2003)(additional citations omitted), Magistrate Judge's Recommended Ruling adopted and approved, 2017 WL 2484204 (S.D.N.Y. June 8, 2017). Accord Navan v. Astrue, 303 F. App'x 18, 20 (2d Cir. 2000); Bobkin v. Colvin, No. 12 Civ. 4929 (JMF), 2013 WL 6181991, at *1-2 (S.D.N.Y. Nov. 26, 2013).

The two vocational assessments from Dr. O'Neill are dated March 9 and April 23, 2012, respectively. As plaintiff is aware, ALJ Griswold discussed plaintiff's medical records from 2009 to 2012, and specifically discussed Dr. O'Neill's two assessments of plaintiff's vocational limitations. (See Tr. 144). ALJ Griswold "afforded little weight to [those]

opinions[,]" concluding that "they are unsupported by the record, which shows good activities of daily living and only mild episodic vertigo symptoms[,]" and that Dr. O'Neill's "own treatment notes reflect that . . . [plaintiff's] symptoms improved somewhat with medication and physical therapy and that she only has occasional bad days where she is distracted by vertigo . . . ." (Id.). As plaintiff is also aware, she did not appeal ALJ Griswold's decision to this court. ALJ Cooperman's decision incorporates ALJ Griswold's findings, and appropriately applied res judicata "to the period of time at and prior to Judge Griswold's decision[.]" (Tr. 22, n.4). ALJ Cooperman is correct that there are no opinions on plaintiff's vocational capacity for the time period at issue in his decision. (Tr. 24). Moreover, he appropriately referenced the two opinions of the State agency medical consultants that were issued during the relevant period, and which contradicted the severity of plaintiff's claimed limitations. (Tr. 24; see Tr. 159-61, 173-74). Accordingly, the Court finds no error in the ALJ's treatment of the medical opinions.

## 2. CONSIDERATION OF PLAINTIFF'S DRIVING WHILE ALLEGING TOTALLY DISABLING EPISODES OF VERTIGO

Plaintiff contends that the ALJ erred in evaluating plaintiff's RFC by substituting his own medical opinion, in the absence of an opinion from a medical expert, that individuals with vertigo should not be driving, and by doing so, the "ALJ . . . imposed a criteria that precludes a finding of disability." (Dkt. #17, Brief at 11-12). Defendant counters that by relying on the medical consultants and plaintiff's ongoing driving, the ALJ reasonably found that plaintiff's vertigo would not preclude a range of light work. (Dkt. #18, Brief at 12-15).

A claimant's RFC is defined as "what an individual can still do despite his or her limitations." Social Security Ruling ["SSR"] 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996); see also 20 C.F.R. § 416.945(a)(1). As plaintiff acknowledges in her brief, an RFC

assessment must be based on "all of the relevant evidence in the case record," which includes: medical history; medical signs and laboratory findings; the effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain; evidence from attempts to work; the need for a structured living environment; and, work evaluations, if available. SSR 96-8p, 1996 WL 374184, at *5 (emphasis in original). In this case, the ALJ incorporated into his RFC finding the two State agency medical consultants' opinions that plaintiff had climbing and balancing limitations, and should avoid exposure to all hazards. (Tr. 25-26; see Tr. 159-61, 173-74). Additionally, in his decision, the ALJ accurately recited plaintiff's hearing testimony regarding her daily activities, which includes that she drives two to three times a week, and does not consider it dangerous to drive. (Tr. 23). He also accurately noted that plaintiff "drives a car, despite never knowing when her attacks of vertigo could occur." (Tr. 24 (footnote omitted)).[18] The ALJ concluded that "[a]s to [her vertigo], she is able to drive a car, which [in the ALJ's] view, is the most significant, and [in the ALJ's] view, conclusive refutation of her claim of disabling vertigo." (Id.). The ALJ's decision is supported by his proper consideration of plaintiff's daily activities, in addition to the medical evidence in the record, and the opinions of two State agency medical consultants. See Cichocki v. Astrue, 729 F.3d 172, 178 (2d Cir. 2013)(per curiam)(holding that ALJ's reliance on medical assessments and the fact that the plaintiff walked her dogs and cleaned her house was consistent with an RFC

---

[18]As discussed above, plaintiff testified that she is able to hear other drivers, and she can hear sounds on the road (Tr. 45), and that she does not "step foot in [her] car[]" on days when she does not feel well. (Tr. 54; see also Tr. 444, 446, 527). She acknowledged that she never knows when the attacks will come on (Tr. 54; see also Tr. 562), and she testified that she gets a "few seconds" warning prior to getting a full-fledged vertigo attack. (Tr. 56). However, she also reported that "even sitting[,] vertigo happens at any time without warning." (See Tr. 445-46).

finding that the plaintiff could perform light work); see also Roma v. Astrue, 468 F. App'x 16, 19 (2d Cir. 2012)(concluding that ALJ need not defer to medical opinion evidence that conflicted with plaintiff's ability to perform activities including driving, reading, sending email and independently performing activities of daily living while plaintiff's wife worked full-time). See Frazier v. Comm'r of Soc. Sec., 16 Civ. 4320 (AJP), 2017 WL 1422465, at *13-14 (S.D.N.Y. Apr. 21, 2017)(ALJ's assessment that plaintiff maintained the ability to work with limitations is supported by fact that despite plaintiff's complaints of disabling episodes of dizziness, she maintained the ability to perform numerous activities of daily living, including driving). Although plaintiff argues in favor of a different interpretation of the ALJ's consideration of the evidence, the ALJ did not err in considering her activities of daily living, and specifically, her driving, as evidence against her claim that her vertigo precludes her from performing all work.

## B. LISTINGS LEVEL IMPAIRMENT

For a claimant's impairment to meet Listing 2.07, a claimant must experience:

Disturbance of labyrinthine-vestibular function (including Meniere's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B:

A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and

B. Hearing loss established by audiometry.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 2.07.  Moreover, disturbances of balance are characterized in the Listings "by an hallucination of motion or loss of position sense and a sensation of dizziness which may be constant or may occur in paroxysmal attacks.  Nausea, vomiting, ataxia, and incapacitation are frequently observed, particularly during the acute attack."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 2.00C.1. Additionally, to evaluate

hearing loss under the Listings, there must be "evidence that [the claimant has] a medically determinable impairment that causes . . . hearing loss and audiometric measurements of the severity of [the] hearing loss." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 2.00B.1.a.

At step three, the ALJ found that plaintiff's vertigo does not meet Listing 2.07 because "[a] requirement necessary for that listing is that the hearing loss be considered progressive." (Tr. 25 (emphasis in original)).[19] The ALJ explained that he rejected the applicability of Listing 2.07 "[o]n the authority of Simmons v. Colvin, [No. 2:13 CV 665, 2015 WL 845689 (E.D. Va. Feb. 24, 2015), approving and adopting Magistrate Judge's decision] and Dombrowski v. Astrue, [No. 11 C 2012, 2011 WL 5903503 (N.D. Ill. Nov. 22, 2011) ][.]" (Id. (alterations added)). In Simmons, the court found substantial evidence to support the ALJ's finding that the claimant did not have a history of progressive hearing loss, and thus Listing 2.07 was not satisfied. 2015 WL 845689, at *8. Similarly, in Dombrowski, the court concluded that the ALJ properly relied on the medical examiner's conclusion that plaintiff's attacks of vertigo and dizziness were not frequent enough to satisfy Listing 2.07. 2011 WL 5903503, at *11-12. In this case, ALJ Cooperman noted that in Dombrowski, "the ALJ found significant that no doctor ever indicated the claimant was unable to drive." (Tr. 25, n.20). The ALJ opined that "[s]uch is the case here as well[,]" and although there "are differences between this case and Dombrowski[,] . . . the requirement of progressive hearing loss, mentioned in both Dombrowski and Simmons as necessary to meet [L]isting 2.07, is simply not shown here." (Id. (emphasis in original)(alterations added)).

Plaintiff contends that the ALJ's decision "contains no specific discussion as to the hearing loss, no discussion of the audiological reports on file, and certainly no discussion of

---

[19](See also Tr. 65-66 (stating on the hearing record that plaintiff does not met Listing 2.07 in light of Dombrowski)).

the results of the reports." (Dkt. #17, Brief at 14).  Plaintiff also contends that the "ALJ does not cite to any facts that support his finding that the plaintiff does not have progressive hearing loss." (Id.).  However, the ALJ's decision does just that.

In his decision, the ALJ discussed plaintiff's hearing, noting plaintiff's history of vertigo, but as stated in records from January 9, 2013, she had no hearing loss (Tr. 22; see Tr. 720-21, 786), her audiogram was "unremarkable[,]" (id.), and that the May 13, 2015 findings by an otalaryngologist were "borderline normal[,]" and that the otolaryngologist recommended "noise/music precautions." (Tr. 23; see Tr. 862).  Additionally, Dr. Charon's records, which the ALJ reviewed, repeatedly reflect that plaintiff has no hearing loss and, until 2015, audiometry testing was normal. (Tr. 698-701, 718-21, 786, 795-96).  In 2015, Dr. Charon noted "[m]ild . . . hearing loss[]" which "represents a worsening since 2012," but he also noted that plaintiff was "still not a candidate for hearing aids." (Tr. 863).[20]  Thus, the record, consistent with the ALJ's findings, does not support anything other than "[m]ild" loss of hearing as of the month prior to the hearing decision. Similarly, throughout his medical records, Dr. O'Neill, plaintiff's treating physician since 2009, repeatedly noted that plaintiff had no hearing loss.  (Tr. 771, 774, 820, 823).  Morever, the medical record reveals that nine days before plaintiff's testing with the otalaryngologist in May 2015, plaintiff reported to Dr. O'Neill that she had some hearing loss but it was not getting worse.  (Tr. 830).

In this case, the two State agency medical consultants considered Listing 2.07 (see

_____

[20]Plaintiff contends that the three audiological tests on record "apparently show a decline in the ability to hear[,]" and after reciting the testing results, plaintiff asserts that"[u]pon information and belief, this means that the plaintiff's hearing is in fact getting worse over time." (Dkt. #17, Brief at 14, n.9).  However, after the first two audiological tests, plaintiff's medical professionals, unlike plaintiff, concluded that plaintiff did not have hearing loss, and it is only after the third test in 2015 that Dr. Charon notes "[m]ild" hearing loss.  (See Tr. 708, 719, 863).

Tr. 158, 172) but concluded that plaintiff's vertigo does not meet Listing level severity. Specifically, Dr. Wurzel noted that plaintiff's "full ENT and neuro [workups] . . . were unremarkable[]"; plaintiff is "able to drive a car, watch TV, computer and read[]"; and, physical exams showed "no neuromuscular deficits."  (Tr. 161).  Similarly, in addition to relying on the same records referenced by Dr. Wurzel, Dr. Zuniga relied on records from February and November 2013, and February 2014 in which plaintiff had "no ocular finding w[ith] min[imal] vertigo w[ith] maneuver. Ear [exam] was unremarkable. MRI and MRA were normal[,]" and negative vertigo testing.  (Tr. 174).  In light of the content of the medical records considered by the ALJ, the Court concludes that the ALJ's decision that plaintiff does not meet Listing 2.07 is supported by substantial evidence.

### IV. CONCLUSION

For the reasons stated above, plaintiff's Motion for Order to Reverse the Decision of the Commissioner, or in the alternative, Motion for Remand for a Rehearing (Dkt. #17) is denied, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #18) is granted.

Dated at New Haven, Connecticut, this 8th day of February, 2018.


_/s/ Joan G. Margolis, USMJ_
Joan Glazer Margolis
United States Magistrate Judge